USDC SCAN INDEX SHEET

















SUI  4/5/04 6:49

3:04-CV-00659  TAM V. KUEHL

*1*

*CMP.*

M. Gayle Askren
State Bar No. 52189
Askren Law Firm of California, P.L.C.
1224 Tenth St., Suite 206
Coronado, CA 92118
(619) 435-9301

Attorney for Qui Tam Plaintiff, Aaron Kuehl

FILED

APR - 1 2004

CLERK U S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
*EX REL*. AARON KUEHL,

        Plaintiff,

    vs.

EDWIN MICKEL, M.D., PATRICIA
HOWARD, DOE MEDICAL CLINIC
AND DOES 2 THROUGH 50,
        Defendants

CASE NO. 04 CV 0659 BTM (RBB)

COMPLAINT FOR DAMAGES
FOR FALSE CLAIMS
Pursuant to 31 U.S.C. §3729

JUDGE ASSIGNED _____

DEPT. _____

## COMPLAINT FOR DAMAGES

## I
## INTRODUCTION

1) This is an action to recover damages and civil penalties on behalf of the United States of
America arising from false statements and claims made and presented by the Defendants
and/or their agents, employees and co-conspirators in violation of the Federal False
Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("the Act"). The violations of the Act
involve false, fraudulent and excessive claims for medical reimbursement that
Defendants have made in periodic billings to Medicare, Medicaid, CHAMPUS, and Tri-
Care for services rendered unnecessarily or not at all. Defendants, and each of them,

ORIGINAL

have concealed the falsity of such claims in order to keep funds to which they were not entitled.

2) The Act provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $10,000.00 for each claim submitted or paid, plus three times the amount of the damages sustained by the Government. Liability attaches both when a Defendant knowingly seeks payment that is unwarranted from the Government and when false records or statements are knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit money to the Government. The Act allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (the "relator") and for the Government and to share in any recovery. The Complaint is filed under seal for 60 days (without service on the Defendants during that period) to enable the Government: (a) to conduct its own investigation without the Defendants' knowledge, and (b) to determine whether to join the action.

3) The Act provides that the government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

4) Based on these provisions, Plaintiff/relator Aaron Kuehl seeks to recover damages and civil penalties arising from Defendants' presentation of false records, claims, and statements to the United States Government and its agents in connection with Defendants' claims for reimbursement for services provided patients under the Medicare, Medicaid, CHAMPUS and Tri-Care programs. Plaintiff also seeks to recover damages arising from Defendants' unlawful practice of permitting records that Defendants have discovered, learned, and know contain erroneous information to be relied upon by the Government's fiscal intermediaries as the basis upon which to pay Defendants excessive reimbursement from federal funds.

## II
## PARTIES

5) This matter is brought by Plaintiff and Qui Tam Relator, Aaron Kuehl (Kuehl), a private person, who is a licensed physician's assistant in the state of California. Kuehl is a former employee of Defendant DOE Medical Clinic, an urgent care medical clinic which submits billings to Medicare, Medicaid, CHAMPUS, and Tri-Care for services rendered to beneficiaries. Defendant DOE Medical Clinic is located at 2340 Eighth St., Suite F, National City, California, 91950. Kuehl brings this action for violations of 31 U.S.C. §§ 3729 *et seq.*, on behalf of himself and the United States Government, pursuant to 31 U.S.C.3730 (b)(1). Kuehl has personal knowledge of the false records, statements and/or claims presented to the Government by and for the Defendants named herein.

6) Defendant Edwin Mickel, M.D., is a licensed physician in the state of California. Defendant Mickel is employed by Defendant Howard, Defendant DOE Medical Clinic, or by DOES 2 through 50, or some of them, to maintain a general medical practice office at 2340 Eighth St., Suite F, National City, California, 91950, and does in fact practice at that location. The official address of record of Defendant Mickel, on file with the Medical Board of California, is 24810 Agusta Drive, Moreno Valley, California, 92388.

7) Defendant Patricia Howard was at all times alleged herein, and continues to be employed by Defendant Mickel, Defendant DOE Medical Clinic, or by DOES 2 through 50, or some of them, as the Office Manager at Defendant DOE Medical Clinic at 2340 Eighth St., Suite F, National City, California, 91950.

8) Defendant DOE Medical Clinic is a sole proprietorship, partnership, corporation or other business entity, to be determined at trial, which is the vehicle for the commission of the acts and omissions leading directly or indirectly to the filing of false claims as alleged herein.

9) Defendants DOES 2 through 50 are owners, shareholders, managers, or other persons or entities who own, direct or control, or otherwise supervise or participate in the medical and business operations conducted at the Defendant DOE Medical Clinic in National City, California, in other and additional medical clinics located in the San Diego,

California, area and in other and additional medical clinics or medical enterprises located within the jurisdiction of this court or such other jurisdictional areas as may ultimately be consolidated in this action.

### III
### JURISDICTION AND VENUE

10) This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions pursuant to 31 U.S.C. §§ 3729 and 3730.

11) This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "Any action under section 3730 may be brought in any judicial district in which the Defendant, or in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

12) Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants Edwin Mickel, M.D., Patricia Howard, DOE Medical Clinic, and DOES 2 through 50, can be found in, reside in, and/or transact business in the Southern District of California, and because the violations of 31 U.S.C. § 3729 described herein occurred, and continue to occur, within this judicial district.

### IV
### FACTS

13) Plaintiff Aaron Kuehl is a licensed physician's assistant (P.A.) in California. In California, a licensed P.A. is authorized to perform medical diagnosis and to order a course of medical treatment for beneficiaries of federal medical programs and other patients, under the direction of a physician.

14) On or about November 28, 2003, Plaintiff Kuehl met with Defendant Howard regarding possible employment by her. Plaintiff Kuehl informed Defendant Howard that he was a licensed P.A. and would like to be employed in that capacity at the medical clinic.

15) Defendant Howard told Plaintiff Kuehl that she had the authority to hire physician's assistants. Defendant Howard further indicated she was from England, is or was a physician in that country, and was unable to obtain a medical license in the United States.

16) Defendant Howard told Plaintiff Kuehl that it was her job to open new urgent care medical clinics in San Diego, and that she acted as office manager for such clinics. Defendant Howard told Plaintiff Kuehl that she previously helped open clinics in Los Angeles and that at least two new clinics were planned for San Diego, one of which is Defendant DOE Medical Clinic. Defendant Howard told Plaintiff Kuehl it was her responsibility to hire physicians, physician's assistants and other staff, as well as to run the clinics.

17) Defendant Howard indicated to Plaintiff Kuehl that in opening new urgent care medical clinics in San Diego, she was working for two other individuals. Defendant Howard did not name those individuals. They are alleged herein to be among Defendants DOES 2 through 50, and their names will be substituted in this action when such names become known. Defendant Howard stated that to her knowledge the two individuals were not physicians and each of them resides or is otherwise located in the Los Angeles area of California. Defendant Howard described the two unnamed individuals as being business partners who were of Armenian descent.

18) Plaintiff Kuehl told Defendant Howard he was currently in the Diversion Program of the Medical Board of California, pursuant to which he was subject to random drug testing and meeting attendance. Defendant Howard indicated she was not concerned about his disciplinary status. At that point, Plaintiff Kuehl and Defendant Howard discussed salary figures.

19) At the November 28, 2003 meeting to discuss the employment of Plaintiff Kuehl, Defendant Howard informed him that the patient population being served at Defendant DOE Medical Clinic was overwhelmingly geriatric and that most of the patients had many medical problems. Defendant Howard stated that Defendant DOE Medical Clinic targeted its advertising to retirement homes and Medicare beneficiaries.

20) In the course of the interview, Defendant Howard pulled two charts from medical files to review with Plaintiff Kuehl.  Together, Defendant Howard and Plaintiff Kuehl reviewed all sections of these charts and the medical information included therein.

21) Defendant Howard declared that most patients' medical conditions were complicated, as indicated by the case histories.  Plaintiff Kuehl observed that on each of the two charts at least a dozen or more separate and discrete diagnoses had been listed as pertaining to the patient.

22) Defendant Howard told Plaintiff Kuehl he would be supervised by a physician, and she gave Plaintiff Kuehl a professional business card bearing the name of one Edwin Mickel, M.D. (Defendant Mickel).  At no time, on November 28, 2003, or subsequently, was the said Defendant Mickel present on the premises of the urgent medical clinic when Plaintiff Kuehl was there.

23) Defendant Howard and Plaintiff Kuehl noted and discussed all the laboratory and other tests that had been ordered on the two patients.  Plaintiff Kuehl observed that similar sets of tests had been ordered by someone at Defendant DOE Medical Clinic for these two different patients.  These tests included, but were not limited to, an EMG for urine problems, an echocardiogram, a breathing test and an ultrasound of the knees.  Plaintiff Kuehl observed that on both charts a battery of blood tests had been ordered.

24) Defendant Howard told Plaintiff Kuehl that, if employed at Defendant DOE Medical Clinic, he was not to treat the patients, but only to order tests and to have conversations with the patients.

25) Near the conclusion of the interview, Defendant Howard indicated to Plaintiff Kuehl that she had decided to hire him immediately.  Defendant Howard stated Plaintiff Kuehl was expected to commence employment the following Monday, December 1, 2003, and to work a four-hour shift from 10:00 a.m. to 2:00 p.m. during which he would see 10 patients.  Defendant Howard told Plaintiff Kuehl that she did not want him to prescribe any medications or alter any patient's current prescription regimens.

26) On or about November 28, 2003, also at Defendant DOE Medical Clinic, Plaintiff Kuehl spoke with a person who introduced himself as a licensed physical therapist. Kuehl inquired into the extent of the man's training and was informed he had trained for only six months. The man indicated that he performed physical therapy at the Defendant DOE Medical Clinic, and stated that patients or third party payors were billed for his services. As a licensed physician's assistant, and having been employed in physician practices at which physical therapy had been performed, Plaintiff Kuehl concluded the man was only a physical therapy assistant and therefore not authorized to use physical therapy codes for billing.

27) On or about December 1, 2003, Plaintiff Kuehl began his employment at Defendant DOE Medical Clinic located at 2340 Eighth St., Suite F, National City, California.

28) On that date Plaintiff Kuehl began a four-hour work shift, during which he saw four patients. Defendant Howard, unlicensed to practice medicine in California, nevertheless reviewed patients' charts after each patient was seen by Plaintiff Kuehl. Defendant Howard provided diagnosis and treatment planning on each and every patient Plaintiff Kuehl had seen.

29) Plaintiff Kuehl observed that items had already been circled on his first patient's history form. The history had already been filled in by someone other than the patient, because information conflicted with what Plaintiff Kuehl himself obtained during the patient interview. Plaintiff Kuehl observed that some or all patients were of foreign extraction and spoke through an interpreter. After Plaintiff Kuehl finished a careful examination of the first of the four patients, he found no current medical condition or pathology that would necessitate any medical treatment. Plaintiff Kuehl took the chart to the unlicensed Defendant Howard for review. Defendant Howard referred Plaintiff Kuehl to all the alleged initial complaints which he had observed to be false or untrue. Defendant Howard directed Plaintiff Kuehl to order tests he felt were unnecessary and laboratory work that Defendant Howard said "all patients will get."

30) Defendant Howard later told Plaintiff Kuehl that he was not to see a patient more frequently than once a month, because the clinic would not get paid for more than one clinic visit per month. Plaintiff Kuehl questioned Defendant Howard about the need to see the patient in order to discuss test results with them, but Defendant Howard answered by reiterating that they would not get paid for the follow-up visit. Plaintiff Kuehl asked Defendant Howard what he was to do if the patient had a sudden problem and would need to be seen more frequently. Defendant Howard told Plaintiff Kuehl to send the patient to his or her regular physician, as the medical clinic would not be paid if the patient were seen more than once a month.

31) Plaintiff Kuehl observed that the Defendant DOE Medical Clinic had a new ultrasound machine, but was without an x-ray machine. Defendant Howard told Plaintiff Kuehl that staff at the medical clinic routinely performed ultrasound studies on most organs or organ systems of each patient, and always performed echocardiogram studies on people with any type of cardiac history.

32) On or about December 1, 2003, Plaintiff Kuehl placed a call to the medical clinic, identified himself, and inquired which physician was seeing patients that day. Plaintiff Kuehl was told by the receptionist, whose name is unknown at this time, that the unlicensed Defendant Howard was seeing patients.

## FIRST CAUSE OF ACTION

Unlawful Practice of Medicine by Defendant Howard, Fraudulent Misrepresentations That Claims Were Medically Necessary and Were Made by Lawful Provider

33) Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1 through 32 as though fully set forth herein. Unlicensed Defendant Howard exercised unlawful authority to hire a licensed Physician Assistant, and unlawfully practiced medicine by directing and controlling the medical discretionary decisions of Plaintiff Kuehl. Defendant Howard unlawfully hired physicians and physician assistants, and unlawfully directed and controlled the medical operations at said clinic. Defendant

Howard unlawfully permitted herself to be employed by individuals who were not physicians licensed in California in the pursuit of her unlawful duties as set forth in paragraphs 1 through 32 above. Defendant Howard engaged in the unlicensed practice of medicine in California by directing and controlling the diagnosis and treatment rendered to individual patients. Defendant Howard unlawfully furthered a plan and scheme whereunder patients were arbitrarily assigned a dozen or more diagnoses for conditions that were unsupported by facts. Defendant Howard unlawfully caused laboratory and other testing to be ordered for individual patients, said laboratory and other testing being excessive and unjustified in fact. Pursuant to a common plan and scheme, Defendant Howard caused unjustified and unnecessary medical testing to occur for each and every patient seen at the medical clinic. Such testing included, but is not limited to, the following: EMG, EKG, breathing tests and ultrasound. By reason of the forgoing unlawful acts, none of which were known to the government, all claims for services, rendered or not, were false and fraudulent.

## SECOND CAUSE OF ACTION

Unlawful Practice of Medicine by Defendants DOES 2 through 50, Fraudulent Misrepresentations That Claims Were Medically Necessary and Services Had Been Made by Lawful Provider

34) Plaintiff realleges and incorporates by reference the allegations and information in Paragraphs 1 through 33 of this Complaint. Unlicensed Defendants DOES 2 through 50, or some of them, engaged in the unlicensed practice of medicine in California by directing and controlling the diagnosis and treatment rendered to individual patients. DOES 2 through 50, or some of them, exercised influence, direction, and control over Defendant Howard and instituted and furthered her unlawful acts. Defendants DOES 2 through 50, or some of them, unlawfully furthered a plan and scheme whereunder patients were arbitrarily assigned a dozen or more diagnoses for conditions that were unsupported by facts. Defendants DOES 2 through 50 unlawfully caused laboratory and

other testing to be ordered for individual patients, said laboratory and other testing being excessive and unjustified in fact.  Pursuant to a common plan and scheme, Defendants DOES 2 through 50 caused unjustified and unnecessary medical testing to occur for each and every patient seen at the Defendant DOE Medical Clinic.  Such testing included, but is not limited to, the following: EMG, EKG, breathing tests and ultrasound.  By reason of the forgoing unlawful acts, none of which were known to the government, all claims for services, rendered or not, were false and fraudulent.

### THIRD CAUSE OF ACTION

Unlawful Failure to Supervise Physician Assistant in the Practice of Medicine by Defendant Mickel, Fraudulent Misrepresentations That Claims Were Medically Necessary and Were Made by Lawful Provider

35) Plaintiff realleges and incorporates by reference the allegations and information in paragraphs 1 through 34 of this Complaint.

36) Defendant Mickel knew or should have known that the unlicensed Defendant Howard was supervising a physician assistant at times when he, defendant Mickel, was not present at the premises nor regularly reviewing the actions of a physician assistant.

37) Defendant Mickel permitted the use of his name on claim forms as having supervised a physician assistant in the performance of his duties, when in fact defendant Mickel had failed to supervise a physician assistant and knew or should have known the claim forms would be submitted bearing the false information or necessary inference he had supervised said physician assistant.

38) Defendant Mickel knew or should have known that defendant Howard and Defendants 2 through 50, at defendant Medical Clinic, were making false or unwarranted diagnoses, providing false and unnecessary treatment, and charging the Government for said unlawful acts through the submission of false claim forms for payment.

///

///

## FOURTH CAUSE OF ACTION

Substantive Violations of the False Claims Act

39) Plaintiff realleges and incorporates by reference the allegations and information in paragraphs 1 through 38 of this Complaint.

40) All claims submitted by the urgent care medical clinic for services and products were false in that each claim proceeded from the unlawful medical direction and control of unlicensed persons.

41) Claims were excessive and unnecessary in that individual patients with different underlying conditions were commonly ordered to undergo unnecessary testing.

42) Claims were false in that untrained receptionists or other nonprofessional persons wrote false histories and false complaints of patients in medical records.

43) All claims are false in that no licensed physician supervised the physician assistants in the performance of their duties.

44) Defendants, and each of them, preyed upon ill or infirm individuals with a language barrier, by targeted advertising and aggressive or coercive marketing tactics, including transportation to and from Defendant DOE Medical Clinic. Defendants unlawfully used the relative lack of medical sophistication and lack of language familiarity of these patients to falsify records of subjective complaints for each.

45) Defendants, and each of them, caused multiple incorrect, fraudulent, and scattergun diagnoses that were unsupported by reliable, objective data, to be entered into the medical records of each patient.

46) Defendants, and each of them, caused false and fraudulent standard diagnoses to be entered into the medical records of each patient.

47) Defendants, and each of them, caused false, fraudulent, unnecessary, and excessive tests to be ordered for and entered into the medical record of each patient.

48) Defendants, and each of them, exercised unlawful restraint upon legitimate medical decision making of licensed providers and usurped the exercise of medical judgment by ordering patient treatment and testing.

49) Defendants, and each of them, exercised unlawful restraint upon legitimate medical decision making of licensed providers and usurped the exercise of legitimate medical judgment to prescribe needed medications and to alter appropriately a patient's current prescription regimen.

50) Defendants, and each of them, made unlawful and fraudulent representation that physical therapy services had been provided by a licensed and qualified physical therapist.

51) Defendants, and each of them, exercised unlawful oversight of diagnoses and treatment planning for patients, pursuant to a scheme whereby unlicensed persons submitted false patient complaints and ordered unnecessary testing and standard boilerplate laboratory work.

52) Through the acts described above and otherwise, Defendants and their agents and employees knowingly presented and caused to be presented to the United States Government and State of California through the Medicaid program, false and fraudulent claims, records and statements in order to obtain reimbursement for health care services provided under Medicare, Medicaid, CHAMPUS and Tri-Care programs.

53) The United States, its fiscal intermediaries, and the Medicare, Medicaid, CHAMPUS and Tri-Care programs, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees paid and continue to pay Defendants for claims that would not be paid if the truth were known.

54) By reason of the Defendants' false records, statements, claims and omissions, the United States and the Medicare, Medicaid, CHAMPUS and Tri-Care programs have been damaged in an amount to be determined at trial, but suspected to be in the millions of dollars.

## FIFTH CAUSE OF ACTION

False Claims Act Conspiracy

55) Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1 through 54 of this Complaint.

56) This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. 3729 et seq., as amended.

57) Through the acts described above and otherwise, Defendants and each of them entered into a conspiracy or conspiracies among themselves and with others to defraud the United States and Medicare, Medicaid, CHAMPUS and Tri-Care programs by getting false and fraudulent claims allowed or paid. Defendants have also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to them or resulted in repayments from them to government programs.

58) The United States, its fiscal intermediaries, and Medicaid, Medicare, CHAMPUS and Tri-Care programs, unaware of Defendants' conspiracies or the falsity of the records, statements and claims made by Defendants and their agents, employees and co-conspirators, and as a result thereof, have paid and continue to pay an amount to be determined at trial in Medicare, Medicaid, CHAMPUS and Tri-Care reimbursement that they would not otherwise have paid. Furthermore, because of the false records, statements, claims and omissions by Defendants and their agents, employees and co-conspirators, the United States, its fiscal intermediaries and programs have not recovered Medicare, Medicaid, CHAMPUS and Tri-Care funds from the Defendants that otherwise would have been recovered.

59) By reason of the Defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged in an amount to be determined at trial, but suspected to be in the millions of dollars, in Medicare, Medicaid, CHAMPUS and Tri-Care funds.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

   (1) That Defendants cease and desist from violating 31 U.S.C. § 3729 et. seq.;

   (2) That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of

Defendants' actions, as well as a civil penalty against each Defendant of $10,000 for each violation of 31 U.S.C. § 3729;

(3) That Plaintiff be awarded the maximum amount allowed pursuant to §3730(d) of the Federal Civil False Claims Act;

(4) That Plaintiff be awarded all costs and expenses of this action, including attorneys' fees; and

(5) That the United States and Plaintiff receive all such other relief as the Court deems just and proper.

Dated: March 29, 2004

M. GAYLE ASKREN
State Bar No. 52189
Askren Law Firm of
California, APLC
1224 Tenth St., Suite 206
Coronado, CA 92118
(619) 435-9301

Attorney for Plaintiff/Relator

1  | M. Gayle Askren
   | State Bar No. 52189
2  | Askren Law Firm of California, P.L.C.
   | 1224 Tenth St., Suite 206
3  | Coronado, CA 92118Declaration
   | (619) 435-9301
4  |
   | Attorney for Qui Tam Plaintiff, Aaron Kuehl
5  |
6  |
7  |
8  |
9  | **UNITED STATES DISTRICT COURT**
   | **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10 |
11 | UNITED STATES OF AMERICA          ) CASE NO.
12 | *EX REL.* AARON KUEHL,            )
13 |                                   ) DECLARATION IN SUPPORT OF
   |           Plaintiff,              ) COMPLAINT FOR DAMAGES
14 |                                   ) FOR FALSE CLAIMS
   |    vs.                            ) Pursuant to 31 U.S.C. §3729
15 |                                   )
   | EDWIN MICKEL, M.D., PATRICIA      )
16 | HOWARD, DOE MEDICAL CLINIC        ) JUDGE ASSIGNED_____
   | AND DOES 2 THROUGH 50,            )
17 |           Defendants              ) DEPT._____
18 |
19 |                **DECLARATION IN SUPPORT OF COMPLAINT**
20 |
21 |      I, AARON KUEHL, declare as follows:
22 |
23 | 1)  I am the Plaintiff/Relator in the matter for which this Declaration is filed pursuant to
24 |     Federal Rule and Statute.
25 | 2)  If called upon to testify in this matter and placed under solemn oath, I would testify,
26 |     competently and relevantly and by my own knowledge, in accordance with the statements
27 |     I make in this Declaration.
28 |

Declaration in Support of Complaint for Damages - 1        ORIGINAL

3) I am a licensed physician's assistant (P.A.) in California.  In California, a licensed P.A. is authorized to perform medical services when the services are rendered under the supervision of a licensed physician and surgeon, pursuant to California Business and Professions Code section 3502(a).

4) On or about November 28, 2003, I went to business premises that were identified as a medical clinic and were located at 2340 Eighth Street, Suite F, National City.  I met with a woman who identified herself as Patricia Howard regarding possible employment by her.  I went there by appointment.  I informed Ms. Howard that I was a licensed physician assistant in the State of California and would like to be employed in that capacity at the medical clinic.

5) Ms. Howard told me that she had the authority to hire physician's assistants.  Ms. Howard further indicated she was from England, is or was a physician in that country, and was unable to obtain a medical license in the United States.

6) Ms. Howard told me that it was her job to open new urgent care medical clinics in San Diego, and that she acted as office manager for such clinics while getting them set up and after they were up and running.  She told me that she previously helped open such clinics in the Los Angeles area and that at least two new clinics were planned for San Diego, one of which is the one where we had the interview on that date.  She told me it was her responsibility to hire physicians, physician's assistants and other staff, as well as to run the clinics.

7) Ms. Howard indicated to me that in opening new urgent care medical clinics in San Diego, she was working for two other individuals who owned the operation. She did not name those individuals, and I do not know how many there are, their locations or specific

functions, or the locations of other clinics like the one in National City. Ms. Howard stated that to her knowledge neither of the two individuals was a licensed physician in this State and each of them resides or is otherwise located in the Los Angeles, California, area. Ms. Howard described the two unnamed individuals as being business partners and as being of Armenian descent. I have no further description of them at this time.

8) In order to be candid with her, I told Ms. Howard I am currently in the Diversion Program of the Medical Board of California, pursuant to which I am subject to random drug testing and regular weekly meeting attendance. Ms. Howard indicated she was not concerned about my disciplinary status. At that point, she and I discussed salary figures.

9) At the November 28, 2003 meeting to discuss my employment, Ms. Howard informed me that the patient population being served at the medical clinic was overwhelmingly geriatric and that most of the patients had many medical problems. She stated that the medical clinic targeted retirement homes and Medicare beneficiaries for its advertising.

10) In the course of the interview, Ms. Howard pulled two medical charts from the files at the medical clinic and stated we would review them together. Together we reviewed all sections of these charts and all the medical information included in each.

11) Ms. Howard declared to me that most patients' medical conditions were complicated, as indicated by the case histories. I noticed that on each chart at least a dozen or more separate diagnoses had been listed as pertaining to the patient.

12) Ms. Howard told me that a physician would supervise me, and she gave me a business card bearing the name of one Edwin Mickel, M.D. I never met, saw, or conferred with Dr. Mickel. Neither Dr. Mickel nor any other physician supervised me, on November 28, 2003, or subsequently, nor was I ever informed he was present on the premises of the

urgent medical clinic when I was there. I never saw any chart he had reviewed or had

any patient for whom I believe he acted as my supervisor.

13) Ms. Howard and I noted and discussed the entire laboratory and other tests that had been

ordered on the two patients. I observed that someone at the medical clinic had ordered

similar sets of tests for these two different patients. These tests included, but were not

limited to, an EMG for urine problems, an echocardiogram, a breathing test, and an

ultrasound study of the knees. I observed that on both charts a battery of blood tests had

been ordered.

14) Ms. Howard told me that, if employed at the medical clinic, I was not to treat the patients,

but only to order tests and to have conversations with the patients. This is an outrageous

limitation on the duties and responsibilities of a licensed physician assistant, and

immediately I became suspicious that Ms. Howard, Dr. Mickel, other clinic personnel, or

perhaps even the unlicensed owners had some plan or scheme to bill insurance carriers in

some fraudulent manner. I felt that they would be using my license to accomplish their

scheme, in some manner I did not understand. However, I said nothing to Ms. Howard,

essentially because I needed the job. I had been out of work for a period of months.

15) Near the conclusion of the interview, Ms. Howard indicated to me that she had decided to

hire me immediately. Ms. Howard stated to me that I was expected to commence

employment the following Monday, December 1, 2003, and to work a four-hour shift

from 10:00 a.m. to 2:00 p.m. during which I would see 10 patients. Ms. Howard told me

that she did not want me to prescribe any medications or alter any patient's current

prescription regimens. Again this was an outrageous demand and limitation upon the

duties and responsibilities of a licensed physician assistant. In fact, Ms. Howard was

directing and controlling the practice of medicine at the medical clinic. Again I felt that Ms. Howard and others would be using my license to accomplish some scheme I did not understand. As before, I said nothing to Ms. Howard about this unreasonable limitation on my duties as a licensed physician assistant.

16) Also on or about November 28, 2003, while at the medical clinic, I spoke with an unnamed man who introduced himself as a licensed physical therapist and an employee at the medical clinic. I inquired into the extent of the man's training and was informed by him that he had trained for only six months. The man indicated that he performed physical therapy at the medical clinic, and stated that patients or third party payors were billed for his services. I have been a licensed physician's assistant for some time and have been employed in other physician's practices where physical therapy has been performed. Based on the man's mere six-months of training, I concluded he was only a physical therapy assistant and therefore was not authorized to use physical therapy codes for billing.

17) On or about December 1, 2003, I began my employment at the medical clinic located at 2340 Eighth St., Suite F, National City, California.

18) On that date I began a four-hour work shift, during which I actually saw four patients. Ms. Howard, though unlicensed to practice medicine in California, nevertheless reviewed the medical chart after I saw each of the four patients. Ms. Howard insisted on diagnosing each patient, though not having seen the patient herself, and on treatment planning for each patient I had seen.

19) I observed that when the chart of the first patient came to me from the front office, items had already been circled on the patient's history form. In other words, someone had

already filled in the history. Though it is not unusual for the patient himself or herself to give a reliable history by filling in the form before being seen by the physician (or physician assistant), I know that was not the case here, because when I sought to confirm the historical data with the patient, the information he gave actually conflicted with what was checked on the form. I observed that some or all patients were of foreign extraction and spoke through an interpreter. After I finished a careful examination of the first of the four patients, I found no current medical condition or pathology that would necessitate any medical treatment whatsoever. I took the chart to Ms. Howard for review. Ms. Howard referred me to all the alleged initial complaints, which I had observed to be false or untrue. Further, she directed me to order tests I felt were unnecessary and to order laboratory work that she said, "all patients will get."

20) Ms. Howard later told me that I was not to see a patient more frequently than once a month, because the clinic would not get paid for more than one clinic visit per month. When I questioned Ms. Howard about the need to see the patient in order to discuss test results with them, she answered by reiterating that the medical clinic would not get paid for the follow-up visit, so I should not see the patient. I asked her what I was to do if the patient had a sudden problem that required him being seen more frequently. She told me to send the patient to his or her regular physician, as the medical clinic would not be paid if the patient were seen more than once a month.

21) While there on November 28 and again on December 1, 2003, I observed that the medical clinic had a new ultrasound machine but did not have an X-ray machine. It is more customary that the reverse would be true. Then Ms. Howard told me the staff at the medical clinic routinely performed ultrasound studies on most organs or organ systems of

each patient.  Ultrasound studies of patients are more expensive to the insuror than X-ray studies.  Ms Howard also stated that staff always performs echocardiogram studies on people with any type of cardiac history.

22) On or about December 1, 2003, I placed a telephone call to the medical clinic, identified myself, and inquired which physician was seeing patients that day.  The receptionist, whose name is unknown to me at this time, told me that Dr. Howard was seeing patients at that time.

23) Similar occurrences took place with respect to each of the remaining three patients I saw on December 1, 2003.  Before leaving the medical clinic that day, I was informed by Ms. Howard that I would be contacted and notified when she had scheduled my next shift at the medical clinic.

I was not contacted again by any person from the medical clinic, and I did not return to the medical clinic for further employment.  I neither demanded nor was offered, any sum in payment for my employment at the clinic on December 1, 2003, or any other time.  Later in December 2003 I contacted my attorney and related the forgoing events to him.  A few days later, also in December 2003, my attorney and I met with a federal agent from San Diego, told him of the above events, and was informed there is no litigation pending at that time against the medical clinic.  I am desirous of filing a complaint against all those responsible for what I sincerely believe to be a pattern of fraud upon the United States.

///

///

///

///

Declaration in Support of Complaint for Damages - 7

1   I declare under penalty of perjury, under the laws of the United States and of the State of

2   California, that the forgoing statements are true and correct. This Declaration is executed on

3   the ___30___ day of March 2004, at ___Coronado___, County of

4

5   ___San Diego___, State of ___California___.

6

7                                                  _____

8                                                  AARON KUEHL, Declarant

JS44
(Rev. 05/89)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

UNITED STATES OF AMERICA
ExRel AARON KUEHL

**DEFENDANTS**

EDWIN MICKEL, M.D., PATRICIA HOWARD, DOE MEDICAL CLINIC, DOES 2 THROUGH 150

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

ASKREN LAW FIRM OF CALIF, PLC

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** RIVERSIDE, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

APR 1 2004

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

ASKREN LAW FIRM OF CALIF, PLC
M. GAYLE ASKREN, Atty at Law
1224 TENTH STREET, SUITE 206
CORONADO, CA 92118-3420

**ATTORNEYS (IF KNOWN)**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

'04 CV 0659 BTM DEP(RBB)

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)
**FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)**

31 U.S.C. Sec. 3729, Federal False Claims Action brought by Qui Tam Plaintiff by reason of alleged fraudulent claims for medical reimbursement

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
|  | **PERSONAL INJURY** | **PERSONAL INJURY** |  |  |  |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander |  | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment |  |  | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☒ 370 Other Fraud | ☐ 660 Occupational Safety /Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
|  |  |  | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty |  |  | ☐ 950 Constitutionality of State |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other |  |  | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights |  |  |  |
| ☐ 290 All Other Real Property |  | ☐ 555 Prisoner Condition |  |  |  |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding
☐ 2 Removal from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** TBD
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.r.c.p. 23
**DEMAND $** To be determined
Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES ☐ No

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE _____ Docket Number _____

**DATE** 3-31-04

**SIGNATURE OF ATTORNEY OF RECORD** _M Gayle Askren_

#102370    150- MS